```
                                              FILED by       MC    D.C.
                                              ELECTRONIC

                                                   Aug 9 2005

                                              CLARENCE MADDOX
                                              CLERK U.S. DIST. CT.
                                              S.D. OF FLA. - MIAMI
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.: 05- 60590-CIV-MARRA

LANCER PARTNERS, L.P.,

    Plaintiff,

vs.

TOTAL FILM GROUP, INC.,

    Defendant.

_____/

## AMENDED COMPLAINT

Plaintiff, Lancer Partners, L.P. ("Partners"), through undersigned counsel, hereby sues Defendant, TOTAL FILM GROUP, INC. (the "Defendant"), and alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1334(b).

2.    This Court has personal jurisdiction over the Defendant pursuant to Federal Rule of Bankruptcy Rule 7004 and the Florida Statues.

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

### BACKGROUND FACTS

5.    In 1993, Michael Lauer ("Lauer") formed a New York limited partnership which he eventually named Lancer Partners, L.P. under the laws of the State of New York. In

4/gz

November, 1997, Lauer formed Partners as a limited partnership under the laws of the State of Connecticut and he merged the two partnerships.

6. Partners was an investment fund in which limited partners contributed money to be invested in a portfolio of securities.

7. Lancer Management Group II, LLC ("Lancer II") served as Partners' general partner and investment manager.

8. Lauer was the founder and principal owner of Lancer II.

9. Lauer served as Lancer II's manager and thus as the *de facto* investment manager for Partners.

10. Lancer II's advisory fee for managing Partners was approximately 1% per year, and was calculated by multiplying Partners' NAV at the beginning of each fiscal quarter by 0.25%.

11. Lancer II also received an "incentive fee" equal to 20% of the net profits of Partners, as calculated on the last day of Partners' fiscal year.

12. Lancer Offshore Inc. ("Offshore") is a British Virgin Islands ("BVI") international business company incorporated in September 1995.

13. Lancer Management Group LLC ("LMG") managed Offshore.

14. This fee structure provided Lauer with both the incentive and the means to artificially inflate the value of Partners' holdings. A higher net asset value would result in higher fees; and the determination of the net asset value used to determine those fees rested with Lauer alone.

15. Lauer caused Partners to pursue a risky investment strategy focusing almost exclusively on small and micro-cap stocks with poor fundamentals.

2

16. These "fallen angels" included Fidelity First Financial Corporation, Biometrics Security Technology, Inc., SMX Corp., XtraCard Corp. and Total Film Group, Inc. (collectively the "Target Companies").

17. All of these companies were traded on the "pink sheets" - the small, relatively illiquid market for micro-capital stocks.

18. The Target Companies had virtually no earnings. None of them made any material earnings from operations.

19. Only one of the Target Companies realized a profit and that was a result of cancellation of debt, not from operations.

20. Lauer manipulated the value of the Target Companies in order to inflate the net asset values of Partners, attract more investors, induce remaining investors not to redeem their shares, and generate additional management fees for Lancer II and, in turn, himself.

21. Lauer inflated the stated net asset value of Partners' holdings in the Target Companies in at least two ways.

22. First, Lauer made manipulative trades in these Target Companies at the end of trading sessions late in each month - a practice known as "marking the close."

23. Lauer placed orders for small numbers of shares in the thinly traded Target Companies at prices much higher than offered by anyone else in the market near the end of the trading days at the end of the period utilized to determine the net asset value of Partner's holdings for purposes of calculating fees.

24. Often this would be the only retail transaction in shares of the Target Companies during a single day.

25. Lauer used this "last trade price" as the per-share value of the Target Companies'

3

shares and projected that value onto all of the shares in each Target Company held by Partners, thus inflating the stated net asset value of Partners.

26. These inflated net asset values for Partners in turn inflated the fees payable to Lauer and, convinced new investors to deposit new money into Partners and convinced current investors to maintain their investments in Partners.

27. The second method used by Lauer to inflate the net asset value of Partners' holdings was bogus accounting valuation.

28. The valuations commissioned and employed by Lauer failed to satisfy applicable standards in the valuation industry. These bogus evaluations relied upon unreliable market prices for thinly traded securities, unjustified prices of private transactions, and baseless and unrealistic projections and hypotheticals.

29. At all times relevant to this Complaint, the actual net asset value of Partners' holdings, without taking into account the influence of the manipulative trading and valuation practices, never exceeded the amount of principal deposited by investors in Partners. Thus, Partners lacked any excess profits with which to make distributions and redemptions to investors.

30. Nevertheless, Partners continued to honor redemption requests submitted by investors seeking to cash out the "profits" apparent from the artificially inflated net asset value of Partners' holdings.

31. On April 16, 2003 (the "Petition Date"), Partners commenced a Chapter 11 bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court").

4

32. On January 9, 2004, Partners filed an Agreed Motion to Transfer Venue of the Bankruptcy Case to this Court (the "Motion to Transfer Venue").

33. On February 10, 2004, the Connecticut Bankruptcy Court entered an Order granting the Motion to Transfer Venue (the "Transfer Order").

34. Paragraph 2 of the Transfer Order provides that the Bankruptcy Case "is hereby transferred to the United States District Court for the Southern District of Florida to be administered by the District Court as a bankruptcy case under Title 11 and pursuant to 28 U.S.C. § 1334(a) through (c)."

35. The Defendant received the transfers identified on Exhibit "A" from or on behalf of Partners on the dates and in the amounts set forth in Exhibit "A."

36. Upon information and belief, some of the funds transferred to the Defendant may have been dissipated.

37. Upon information and belief, as of the time of the filing of this action, additional property transferred to the Defendant may still be in his/her/its possession or control. Accordingly, Partners hereby sues to recover the transfers identified on Exhibit "A" and all other transfers by Partners to the Defendant within the four-year period preceding the Petition Date (collectively the "Transfers").

38. As of the date of the Transfers, the Petition Date and the date of the Complaint, a creditor existed that could avoid the Transfers under applicable law.

39. Partners remains a debtor-in-possession under § 1101 of the Bankruptcy Code. No trustee or examiner has been appointed in the Bankruptcy Case.

CASE No.60590-CIV-MARRA

## COUNT I
## ACTUAL FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b), Fla. Stat. §§ 726.105(1)(a)
## and 726.108 and other applicable law[1]

40. The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 39 above.

41. Partners made the Transfers to or for the benefit of the Defendant within four years prior to the Petition Date.

42. Lauer caused Partners to make the Transfers to the Defendant with the actual intent to hinder, delay and defraud the creditors of Partners.

43. Partners did not receive reasonably equivalent value in exchange for the Transfers made to the Defendant.

**WHEREFORE**, Partners demands judgment against the Defendant in the amount of the Transfers, together with prejudgment interest from the date of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law, and any further relief that this Court deems just, fair, and equitable.

## COUNT II
## CONSTRUCTIVE FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b), Fla. Stat. §§ 726.105(1)(b)
## and 726.108 and other applicable law

44. The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 39 above.

45. Partners made the Transfers to or for the benefit of the Defendant within four years prior to the Petition Date.

---

[1] Partners assumes Florida's enactment of the Uniform Fraudulent Transfer Act governs this Amended Complaint, however, the law of the other states may apply.

6

46. Partners made the Transfers to or for the benefit of the Defendant without receiving reasonably equivalent value in exchange for such Transfers.

47. Partners was insolvent at the time the Transfers were made.

48. Partners made the Transfers to or for the benefit of the Defendant for less than fair consideration.

49. The net assets of Partners were unreasonably small in relation to the Transfers.

50. At the time the Transfers were made to or for the benefit of the Defendant, Lauer knew that Partners was insolvent, and that Partners would not be able to satisfy all of its liabilities as they came due.

51. At the time the Transfers were made to or for the benefit of the Defendant, Partners was engaged in, or was about to engage in, a business or a transaction for which the remaining assets of Partners were unreasonably small in relation to the business or transaction.

52. At the time the Transfers were made to or for the benefit of the Defendant, Lauer knowingly caused Partners to incur, or reasonably should have known that it would incur, debts beyond its ability to pay as they came due.

**WHEREFORE**, Partners demands judgment against the Defendant in the amount of the Transfers, together with prejudgment interest from the date of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law, and any further relief that this Court deems just, fair, and equitable.

### COUNT III
### CONSTRUCTIVE FRAUDULENT TRANSFER
**11 U.S.C. § 544(b), Fla. Stat. §§ 726.106(1)
and 726.108 and other applicable law**

53. The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 39 above.

7

54. Partners made the Transfers to or for the benefit of the Defendant within four years prior to the Petition Date.

55. Partners made the Transfers to or for the benefit of the Defendant without receiving reasonably equivalent value in exchange for such Transfers.

56. Partners was insolvent at the time the Transfers were made, or became insolvent as a result of the Transfers.

**WHEREFORE**, Partners demands judgment against the Defendant in the amount of the Transfers, together with prejudgment interest from the date of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law, and any further relief that this Court deems just, fair, and equitable.

## COUNT IV
## UNJUST ENRICHMENT

57. The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 39 above.

58. The Defendant has been unjustly enriched at the expense of Partners, by receiving the Transfers.

59. It would be inequitable to permit the Defendant to retain the benefit of the Transfers because the Transfers consisted of other investors' misappropriated contributions to Partners.

60. Additionally, it would be inequitable to permit the Defendant to retain the benefit of the Transfers because Partners did not receive reasonably equivalent value in exchange for the Transfers.

61. The Defendant was not entitled to the Transfers because the Transfers were obtained from the Transferor through Lauer's misconduct.

8

62. It would be inequitable to permit the Defendant to retain the benefit of the Transfers at the expense of Partners and other investors in and creditors of Partners.

63. Partners does not have an adequate remedy at law and is therefore entitled to relief under the equitable doctrine of unjust enrichment[2].

**WHEREFORE**, Partners demands judgment against the Defendant in the amount of the Transfers, together with prejudgment interest from the date of the Transfers, costs, and any further relief that this Court deems just, fair, and equitable.

Dated: August 8, 2005

**HUNTON & WILLIAMS LLP**
*Attorneys for the Debtor*
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Telecopier: (305) 810-2460

By: _____
Jeffrey P. Bast (FBN 996343)
Andrew D. Zaron (FBN 965790)

---

[2] Partners pleads this equitable claim in the alternative to its legal claims.

## Exhibit A

| Fund | Payee Name | Transaction Date | Proceeds |
|---|---|---|---|
| Partners | Total Film Group Inc | 10/31/1997 | (75,000) |
| Partners | Total Film Group Inc | 3/27/1998 | (187,500) |
| Partners | Total Film Group Inc | 3/30/1998 | (100,000) |
| Partners | Total Film Group Inc | 8/15/2000 | (500,000) |
| Partners | Total Film Group Inc | 12/8/2000 | (500,000) |
| Partners | Total Media Corp | 11/30/2001 | (50,000) |
| | **Total Film Group Inc Total** | | **(1,412,500)** |